UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YANG RONG, a/k/a YEUNG YUNG        :
RHEA YEUNG, and BROADSINO         :        Civil Case No.: 03-1687 RBW
COMPANY, LTD.,                    :
                                 :
            Plaintiffs,           :
                                 :
LIAONING PROVINCIAL               :
GOVERNMENT, a subdivision         :
of the People's Republic of China, :
a foreign state,                  :
                                 :
            Defendant.            :
_____/

### MEMORANDUM OPINION

The plaintiffs, Yang Rong ("Rong"), Rhea Yeung ("Yeung"), and the Broadsino Finance

Company, Ltd. ("Broadsino"), brought this action against Liaoning Provincial Government

("LPG") for conversion, expropriation, the violation of international law and unjust enrichment

pursuant to the Commercial Activity and Expropriation Exceptions to the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1605(a)(2)-(3) (2000).  Currently before the Court

is the Motion of Liaoning Provincial Government to Dismiss First Amended Complaint ("Def.'s

Mot.") [D.E. #11] pursuant to Federal Rules of Civil Procedure 12(b)(1), (2) and (6), the

plaintiff's opposition thereto and the defendant's reply.  For the reasons stated below, the

defendant's motion is granted because this Court does not have subject matter jurisdiction.

I.      **Factual Background**

The plaintiffs filed their initial complaint on August 7, 2003, see Complaint dated August

7, 2003, and their amended complaint on February 13, 2004.  First Amended Complaint

("Compl."). The following is a recitation of the facts as alleged by the plaintiffs.

In 1991, Rong established Broadsino under the laws of Hong Kong. Compl. ¶ 21. Rong has been the Chairman and Chief Executive Officer of Broadsino since its incorporation and has conducted business through Broadsino, acting as its agent or nominee. Id. Broadsino entered into a joint venture with two Chinese companies to form Shen Yang Automotive ("Shen Yang") for the purpose of manufacturing minibuses and other vehicles in China. Id. Rong possessed a 40 percent interest in Shen Yang and was the chief executive officer of the joint venture. Id. ¶¶ 21-22. In an effort to raise capital to increase Shen Yang's production level, Rong was determined to register Shen Yang's stock in the United States and to secure their listing on the New York Stock Exchange ("NYSE"). Id. ¶ 23. This was a challenging goal for Rong since no company based in China had been listed on the NYSE in over 50 years. Id.

Senior Chinese government officials informed Rong that "since this would be the first U.S. registration and listing of a company based in China in 50 years, a Chinese entity, rather than a Hong Kong private company (Broadsino), should be perceived as the majority shareholder of the listed company." Id. After consulting with his counsel on this point, Rong understood that "to satisfy these views expressed by Chinese authorities, the majority interest in the listed company could be held in the name of a Chinese non-governmental organization and that this arrangement would simplify the registration and list of shares." Id. Consequently, Broadsino, the People's Bank of China, and other Chinese entities sponsored the formation of the Chinese Financial Education Development Foundation (the "Foundation") as a non-governmental organization that would, among other things, "serve as a vehicle whereby assets could be held in accordance with the wishes of patrons or contributors, including Yang Rong." Id. ¶ 24 &

Memorandum in Support of Motion of Liaoning Provincial Government to Dismiss First Amended Complaint ("Def.'s Mem.") at 2.  Shang Ming ("Ming"), the deputy governor of the People's Bank of China, served as the Foundation's chairman while Rong served as vice chairman.  Compl. ¶ 24.  According to the plaintiffs, Broadsino and another company controlled by Rong paid the initial expenses of the Foundation.  Id.

In June 1992, Rong incorporated another company, Brilliance Holdings ("Brilliance"), as the corporate entity to be used for the purpose of registering stocks on the NYSE.  Id. ¶ 25.  A month later Brilliance changed its name to Brilliance China Automotive Holdings Limited.  Id. Subsequently, in exchange for Brilliance shares, Broadsino invested its equity interest in Shen Yang .  Id. ¶ 26.  By August 1992, Rong and his nominees were the record owners of 78.43 percent of Brilliance's stocks.  Id. ¶ 27.  In September 1992, Broadsino transferred its Brilliance stocks to the Foundation.  Id. ¶ 28.  According to Rong, he believed that the Brilliance stocks, held on behalf of Broadsino, would be transferred to the Foundation in exchange for $12 million dollars, which the Foundation hoped to receive in donations from local banks.  Id.  However, Ming advised Rong that the Foundation did not receive any of the expected donations from the banks.  Id.  And because the Foundation could not pay for the Brilliance stocks, "Rong and Ming allegedly agreed that the Foundation would hold the [stocks] in trust for Broadsino, in effect acting as the nominee for Broadsino."  Id.  In exchange, Broadsino agreed to pay an administration fee and make certain donations to the Foundation to assist with its development. Id.  Rong and Ming further agreed that Rong, as Vice Chairman of the Foundation, would have the sole authority to manage, control and administer the equity interest in Brilliance held by the Foundation.  Id.  Following the public offering of Brilliance's stocks in the United States, its

stocks held by Rong as nominee for Broadsino were transferred to the Foundation pursuant to the agreement between Rong and Ming.[1]  Id.  According to Rong, despite this transfer, Broadsino and Rong retained beneficial ownership in the stocks and Rong exercised sole authority over the stocks until he was unlawfully divested of his interest in the stocks in 2002.  Id.

In October, 1992, after final approval of the registration statement by the Securities and Exchange Commission ("SEC"), 5 million shares of Brilliance stock were offered for sale.  Id. ¶ 30.  The stocks offered for sale amounted to 28.75 percent of Brilliance's total equity.  Id.  The percentage of Brilliance stock owned by the Foundation was 55.88 percent.  Id.  According to Rong, following the public offering, the Foundation continued to hold the Brilliance stocks on behalf of Broadsino.  Id. ¶ 31.  At Rong's direction, Broadsino paid the costs of registering and listing the public offer of the Brillance stocks as well as paying the administration fees to the Foundation for administering the trust.  Id. ¶¶ 30-31.  Broadsino also gave funds to the Foundation.  Id. ¶ 31.  Moreover, during the period from 1992 to 2002, Brilliance was managed and directed by Rong.  Id. ¶ 32.  He also directly managed Brilliance's primary holding – Shen Yang – from 1995 to 2002.  Id.

In early 2002, the LPG formed a "Working Committee" to assume and exercise control over the Foundation and to acquire from it the Brilliance stocks that it held in trust for Broadsino.

---

[1]According to Rong, his authority to handle all matters associated with the stocks held in the name of the Foundation was confirmed by a power of attorney to that effect, signed by Ming as Chairman of the Foundation on September 8, 1992.  Compl. ¶ 28.  Therefore, Rong continued to have an ownership interest in the Brilliance stocks, and the Foundation was obligated to hold the stocks in trust for the benefit of Broadsino.  Id.  However, the plaintiffs did not attach this particular agreement to the complaint.

Id. ¶ 35.[2]  The LPG appointed Yang Bao Shan, Assistant to the Governor of the LPG, as Deputy

Chief of the Working Committee.  Id.  According to the plaintiffs, the Working Committee

advised Rong that all equity interests held in the name of the Foundation, including Broadsino's

interest in Brilliance, were government assets and demanded that they be transferred to the LPG.

Id.  The Working Committee then allegedly participated in a series of events to implement the

"takeover scheme."  Id. ¶ 36.  First, the LPG informed Rong and the Board of Directors of

Brilliance that the Foundation no longer recognized Broadsino's beneficial interest in Brilliance.

Id.  Also, at the direction of the LPG, Brilliance's Board of Directors dismissed Rong as

Chairman, President, Chief Executive Officer and Director of Brilliance.  Id.  Rong was then

replaced by individuals who were members of the Working Committee.  Id.  Additionally, at the

direction of the LPG, Brilliance unilaterally reduced Rong's salary by two-thirds and then finally

ceased paying him any salary by October 2002.  Id.  The Board of Directors of Brilliance also

terminated the service contract between Rong and Brilliance.  Id.  The LPG subsequently formed

Huachen Automotive Group Holdings Company Limited ("Huachen") and appointed members of

the LPG as officers of Huachen, who were allegedly given valuable stock options in Brilliance.

Id. ¶¶ 36, 37 & Def.'s Mem. at 4.  At the direction of the LPG and pursuant to an agreement

between the Foundation and Huachen, Brilliance's bonds held by the Foundation in trust for

Broadsino were sold to Huachen at a significant discount of their actual value.  Id. ¶ 39.

Additionally, Huachen granted "call options" for approximately 346,305,630 shares of

---

[2]The plaintiffs infer that the Working Committee was formed because Rong had business plans for
Brilliance that the LPG disagreed with.  Compl. ¶ 34.  Specifically, Rong intended to participate in a joint venture
with MG Rover and Shen Yang in another Chinese province.  Id.  Despite the LPG's efforts to dissuade Rong from
making such a substantial investments in another province, he refused to change his business plans for Brilliance.  Id.

Brilliance's stocks, which comprised some of Broadsino's stocks held by Brilliance.  Id. ¶ 40.

Consequently, Broadsino initiated proceedings against the Foundation in Beijing's Municipal

High Court seeking a determination of Broadsino's interest in the assets held by the Foundation,

including the Brilliance stocks.  Id. ¶ 38.  However, Broadsino was denied the opportunity to

pursue its case against the Foundation in the Chinese courts.[3]  Id.

Eventually, Brilliance and Huachen initiated a tender offer for the remaining Brilliance

stocks, including those traded on the NYSE.[4]  Id. ¶ 41.  In conjunction with the tender offer,

Brilliance and Huachen requested that marketing of the Brilliance stocks being traded on the

NYSE be suspended for one day, specifically on December 18, 2002. Id.

Broadsino also instituted a lawsuit in Bermuda against Brilliance, four Brilliance board

members, the Foundation, and Huachen to block the stock transfer from the Foundation to

Huachen.  Id. ¶ 46.  However, the Bermuda court refused to enjoin the transfer and Broadsino

appealed that decision.  Id.   Broadsino claimed that it had transferred Brilliance stock to the

Foundation that were to be held in trust for Broadsino but that the stocks had been unlawfully

appropriated.  Def.'s Mem. at 5.  The Bermuda Supreme Court subsequently ruled on December

31, 2003, that "Broadsino "never owned any shares in [Brilliance], Def.'s Mem. at 5 & Ex. 1

(Judgment on Strike Out Application of the Supreme Court of Bermuda) at 9, and therefore

---

[3]According to the plaintiffs, the Beijing Municipal High Court originally accepted jurisdiction over the case, but the Court later notified Broadsino that it had received a letter and related documents from the LPG Public Security Department concerning economic crimes allegedly committed by Rong.  Therefore, the case was transferred to the LPG Public Security Department for investigation.  Compl. ¶ 38.

[4]According to the plaintiffs, because Huachen's eventual purported purchase of the stock was deemed a transfer of control under Hong Kong law, Brilliance took the position that Huachen and Brilliance's management directors were required to make a tender offer for all Brilliance stocks not beneficially owned by Huachen.  Compl. ¶ 41

concluded that it was "an abuse of the process of the Court to pursue a claim that [Broadsino] transferred any shares in Brilliance to the Foundation." Id.

The defendant has moved to dismiss the complaint pursuant to Rule 12(b)1, (2), & (6) of the Federal Rules of Civil Procedure claiming that this Court does not have subject matter jurisdiction under the Foreign Sovereign Immunities Act.  Def.'s Mot. at 1.  The defendant also asserts that the complaint is barred by the act of state doctrine and the doctrine of international comity.  Id.  Additionally, the defendant claims that the complaint is barred by the principles of issue and claim preclusion as a result of the ruling issued by the Bermuda Supreme Court.  Id. Finally, the defendant moves to dismiss for lack of personal jurisdiction pursuant to 28 U.S.C. § 1330(b) and because there are insufficient contacts with the District of Columbia to satisfy the Due Process Clause.  Id. at 1-2.[5]

## II.  Standards of Review

### A.  Motion to Dismiss Under Rule 12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction, "[t]he plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  In reviewing such a motion, this Court must accept as true all the factual allegations contained in the complaint.  Leatherman

---

[5]Rong states that because the Foundation was an entity that could hold property for him, he used the Foundation as an investment vehicle.  Compl. ¶ 47.  Consequently, he claims that from 1993 to 2002 the Foundation held Rong's interests that he possessed in a number of other companies.  Id.  Rong posits that he provided funds to the Foundation for investments, either directly or through holding companies, or transferred stocks to the Foundation that in turn were held in trust by the Foundation for Rong or his nominees.  Id.  With respect to Rong's interests in these other companies, he claims that as part of the LPG's unlawful scheme, it appropriated other interests held by the Foundation for his benefit.  Id. ¶ 48.  However, none of these companies are named plaintiffs in this action.  This Court will therefore not consider any allegations with respect to these other companies.

v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

Additionally, in deciding a Rule 12(b)(1) motion, it is well established in this Circuit that a court

is not limited to the allegations in the complaint, but may also consider material outside of the

pleadings in its effort to determine whether the court has jurisdiction in the case.  See EEOC v.

St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l

Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C.

Cir. 1987); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C.

2001).

### B.      Motion to Dismiss Under Rule 12(b)(2)

When personal jurisdiction is challenged pursuant to Federal Rule of Civil Procedure

12(b)(2), the "[p]laintiffs have the burden of proof to establish that the Court has personal

jurisdiction. . . . All factual disputes concerning jurisdiction must be resolved in favor of the

plaintiffs, . . . and plaintiffs need only make a prima facie showing of personal jurisdiction in

order to defeat [a] defendant['s] motion."  Jacobsen v. Oliver, 201 F. Supp. 2d 93, 104 (D.D.C.

2002).  Moreover, the plaintiffs' assertions of fact are "presumed to be true unless directly

contradicted by affidavit,"  DSMC, Inc. v. Convera Corp., 273 F. Supp. 2d 14, 20 (D.D.C. 2002)

(citation omitted), or other evidence.  As with a Rule 12(b)(1) motion, when reviewing a

challenge pursuant to Rule 12(b)(2), the court may consider documents outside the pleadings to

assure itself that it has jurisdiction.  See Land v. Dollar, 330 U.S. 731, 735 n.4 (1947) ("when a

question of the District Court's jurisdiction is raised, either by a party or by the court on its own

motion, . . . the court may inquire by affidavits or otherwise, into the facts as they exist.")

(citations omitted); Haase, 835 F.2d at 906; Artis v. Greenspan, 223 F. Supp. 2d 149, 154

(D.D.C. 2002).

**C.      Motion to Dismiss Under Rule 12(b)(6)**

On a motion to dismiss for failure to state a claim upon which relief can be granted

pursuant to Rule 12(b)(6), this Court must construe the allegations and facts in the complaint in

the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences

that can be derived from the facts alleged.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr v.

Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Communications Corp., 16

F.3d 1271, 1276 (D.C. Cir. 1994)).  However, the Court need not accept asserted inferences or

conclusory allegations that are unsupported by the facts set forth in the complaint.  Kowal, 16

F.3d at 1276.  In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only

consider the facts alleged in the complaint, documents attached as exhibits or incorporated by

reference into the complaint, and matters about which the Court may take judicial notice.  St.

Francis, 117 F.3d at 624-25.  The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the

defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief."  Conley, 355 U.S. at 45-46.

**III.    Analysis**

**A.      The Foreign Sovereign Immunities Act ("FSIA")**

The FSIA is "'the sole basis for obtaining jurisdiction over a foreign state in our courts.'"

Peterson v. Royal Kingdom of Saudi Arabia, 332 F. Supp. 2d 189, 195 (D.D.C. 2004) (quoting

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).  "The basic

premise of the FSIA is that foreign sovereigns are immune from suit in the United States unless

the action falls under one of the specific exceptions enumerated in the statute."  Id. (citing 28

U.S.C. § 1604).  "If the foreign sovereign is not immune, the federal district courts have exclusive jurisdiction over the action."  Id. (citing 28 U.S.C. §§ 1330, 1604; Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 42 (D.D.C. 2000)(citation omitted)); Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)).  Once a defendant presents a prima facie case that it is a foreign sovereign, a plaintiff "bear[s] the burden of producing evidence to show that there is no immunity and that the court therefore has jurisdiction over the claims."  Daliberti, 97 F. Supp. 2d at 42 (citing Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for Galadari, 12 F.3d 317, 325 (2d Cir.1993); Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2nd Cir.1993)).

A court may dismiss a complaint brought under the FSIA only if it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. Id. at 42-43 (citing Neitzke v. Williams, 490 U.S. 319, 326-27 (1989) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, (1984)); Kowal, 16 F.3d at 1276.  At this stage of the proceedings, the Court must accept as true all facts alleged by the plaintiffs.  Daliberti, 97 F. Supp. 2d at 43. "[T]he question is whether the facts alleged are sufficient to establish the jurisdiction of this Court under an exception to immunity under the FSIA and is sufficient to state a claim upon which relief may be granted."  Id.

Here, the defendant argues that this Court lacks subject matter jurisdiction pursuant to the FSIA to adjudicate the plaintiffs' claims that a sovereign political subdivision of China has allegedly expropriated their purported intangible property interests.  Def.'s Mot. at 1.  The defendant further alleges that "[b]ecause neither exception [to the FSIA] applies as a matter of law, this Court should dismiss the Complaint for lack of jurisdiction."  Def.'s Mem. at 7.  The

10

plaintiffs on the other hand, assert that "[t]his Court has jurisdiction because two of the FSIA

exceptions to sovereign immunity are applicable: the commercial activity exception of §

1605(a)(2) and the expropriation exception of § 1605(a)(3)."  Plaintiffs' Opposition to Defendant

Liaoning Provincial Government's Motion to Dismiss First Amended Complaint ("Pls.' Opp'n")

### 1.     The Commercial Activity Exemption

The commercial activity exemption to the FSIA provides that

> [a] foreign state shall not be immune from the jurisdiction of courts
> of the United States or of the States in any case in which: the action
> is based upon a commercial activity carried on in the United States
> by the foreign state; or upon an act performed in the United States
> in connection with a commercial activity of the foreign state
> elsewhere; or upon an act outside the territory of the United States
> in connection with a commercial activity of the foreign state
> elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (emphasis added).  The plaintiffs rely on the third clause of 1605(a)(2) as

grounds for their position that sovereign immunity is not a bar to this Court exercising

jurisdiction in this case.  Pls.' Opp'n at 7; Def.'s Mem. at 7.  "The third clause deprives a foreign

sovereign of immunity for actions based "upon an act outside the territory of the United States in

connection with a commercial activity of the foreign state elsewhere and that act causes a direct

effect in the United States."  Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438,

449 (D.C. Cir. 1990) (quoting 28 U.S.C. § 1605(a)(2)).  Therefore, this Court must determine

whether "this lawsuit is (1) 'based . . . upon an act outside the territory of the United States'; (2)

that was taken 'in connection with a commercial activity' of [the LPG] outside this country; and

(3) that 'caused[d] a direct effect in the United States.'"  Republic of Argentina v. Weltover, Inc.,

504 U.S. 607, 611 (1992)).

**Does the LPG's Actions Qualify as Commercial Activity?**

Pursuant to the FSIA, a commercial activity is defined as " either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction, rather than by reference to its purpose."  28 U.S.C. § 1603(d); Foremost-McKesson, 905 F.2d at 449; Daliberti, 97 F. Supp. 2d at 46-47.  The nature of the conduct is "the outward form of the conduct that the foreign state performs or agrees to perform."  Weltover, 504 U.S. at 617.  "In examining this statutory language, the Supreme Court has concluded that 'the issue is whether the particular actions that the foreign state performs . . . are the type of actions by which a private party engages in trade and traffic or commerce.'"  Daliberti, 97 F. Supp. 2d at 47 (quoting Weltover, 504 U.S. at 614 ).  "'[A] state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, rather than those powers peculiar to sovereigns.'"  Id. (quoting Saudi Arabia v. Nelson, 507 U.S. at 349-50.  For example, "a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods."  Weltover, 504 U.S. at 614- 615 (citation omitted).

The defendant characterizes the plaintiffs' complaint as accusing the LPG "of committing an expropriation or confiscation."  Def.'s Mem. at 8 (citing Compl. ¶¶ 37, 54).  The defendant claims that "taking over or expropriating private property through the forced transfer of assets 'is a quintessential Government act.'"  Id. at 9 (quoting Alberti v. Empresa Nicarguense de la Carne,

705 F.2d 250, 254 (7th Cir. 1983).  The LPG opines that the "'wrongful' taking of property alleged by the Complaint is not the stuff of garden-variety commercial transactions."  Id. Moreover, it contends that "the complaint makes it clear that no private party could have done what the plaintiffs accuse the [LPG] of doing."  Id.  According to the defendant, the complaint supports their position by "alleg[ing] that the [LPG] did not act 'in a manner of a private player within' the market, but instead commandeered it."  Id. (citing Weltover, 504 U.S. at 614.)

On the other hand, the plaintiffs claim that the LPG's acts were "in connection with commercial activities" and were "clearly the action of a private player in the market."  Pls.' Opp'n at 7 & 8.  Specifically, they allege that the LPG created a wholly-owned subsidiary and then used that entity to purchase, by contract, the Brilliance shares at a firesale price and thus acted "'not as a regulator of a market, but in the manner of a private player within it.'"  Id. at 9 (quoting Weltover, 504 U.S. at 614.)

The plaintiffs cite Weltover as support for their position that the "activity of the LPG was that of a private player in the market."  Pls.' Opp'n at 7.  Although Weltover decided the precise question at issue here – whether "this lawsuit is (1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the LPG] outside this country; and (3) that 'caused[d] a direct effect in the United States,'"  Weltover, 504 U.S. at 611 – it does not support the plaintiffs' position.  In Weltover, bond holders brought a breach of contract action against the Republic of Argentina and Banco Central De La Republica, Argentina's central bank.  Id. at 609.  As part of a plan to stabilize Argentina's currency, Argentina and its central bank (collectively "Argentina") issued government bonds called "Bonods" to their creditors.  Id.  The Bonods authorized repayment in United States currency

through transfers in several market locations, including New York City.  Id.  When the Bonods

began to mature, Argentina concluded that it "lacked sufficient foreign exchange to retire them."

Id. at 610.  Pursuant to a Presidential Decree, Argentina "unilaterally extended the time for

payment and offered bond holders substitute instruments as a means of rescheduling the debts."

Id.  The bond holders declined to accept the rescheduling and insisted on full payment, specifying

New York as the place where payment should be made.  Id.

Argentina refused payment thereby prompting the bond holders to bring a breach of

contract action in the United States District Court for the Southern District of New York, relying

on 28 U.S.C. § 1605(a)(2), the commercial activity exception of the FSIA, as the basis for that

court's jurisdiction.  Id.  Argentina moved to dismiss for, inter alia, lack of subject matter

jurisdiction.  Id.  The District Court denied the motion and the United States Court of Appeals for

the Second Circuit affirmed.  Id.  In the Supreme Court, the only questions considered were

"whether [the] lawsuit [was] (1) 'based . . . upon an act outside the territory of the united States';

(2) that was taken 'in connection with a commercial activity' of Argentina outside this country;

and (3) that 'caused[d] a direct effect in the United States.'"  Id. at 611.  The Supreme Court

ultimately concluded that "Argentina's issuance of the Bonods was a 'commercial activity' under

the FSIA."  Id. at 617.  The Court reasoned that "when a foreign government acts, not as a

regulator of a market, but in the manner of a private player within it, the foreign sovereign's

actions are 'commercial' within the meaning of the FSIA."  Id. at 614.  The Court noted that

> The commercial character of the Bonods is confirmed by the fact
> that they are in almost all respects garden-variety debt instruments:
> They may be held by private parties; they are negotiable and may
> be traded on the international market (except in Argentina); and
> they promise a further stream of cash income.

Id. at 615.  Accordingly, the Court held that "Argentina's issuance of the Bonods was a 'commercial activity' under the FSIA."  Id. at 617.

As support for their position, the plaintiffs also rely on Foremost-McKesson, stating that it is "a remarkably similar case."  Pls.' Opp'n at 11 (citing Foremost-McKesson, 905 F.2d at 441).  However, this Court does not agree that Foremost-McKesson supports the plaintiffs' position, as it is plainly distinctive.[6]  There, an action was brought against Iran and a dairy company located in Iran alleging that Iran, "acting through various codefendants who controlled the shares and the board of directors of [the] dairy, used its majority position to lock the plaintiffs out of the management of the dairy and to deny the [plaintiffs] their share of the company's earnings."  Foremost-McKesson, 905 F.2d at 439.  Foremost-McKesson, a Maryland corporation, had assisted a group of Iranian nationals in establishing the dairy ("Pak Dairy") in Iran.  Id. at 440-41.  Foremost-McKesson provided the individuals who staffed the top management positions at the dairy, controlled its Board of Directors and held thirty-one percent of the equity interest in the dairy.  Id. at 441.  Foremost-McKesson claimed that Iran, "acting through the co-defendant agencies and instrumentalities, illegally divested Foremost of its investment in [the] [d]airy.[7]  Id.  Foremost-McKesson and the Overseas Private Investment Corporation ("OPIC"), an agency of the United States that insures private overseas investments of United States nationals, sought compensation for the entire value of their jointly held 19.84% insured equity

---

[6]The procedural history of the cases is somewhat similar in that the parties in Foremost-McKesson submitted their claims to another tribunal, as did the plaintiffs who initially submitted their claims to the Supreme Court of Bermuda.  See Compl. ¶ 46.

[7]These agencies and instrumentalities included the Financial Organization for the Expansion of Ownership of Productive Units, the National Investment Company of Iran, Industrial and Mining Development Bank of Iran, and the Foundation for the Oppressed and Pak Dairy.  Foremost-McKesson, 905 F.2d at 441.

interest in the dairy,[8] compensation for their share in any dividends declared and not received

before the alleged divestment of their equity interest, and other damages, including attorneys'

fees.  Id.  Iran responded that "prosecution of the suit was barred by the [] Algiers Accords of

January 19, 1981, and that pursuant to Executive Order No. 12, 294, . . . the "complaint ha[d] no

legal effect other than to toll the applicable statute of limitations."  Id. (footnotes omitted).

Pursuant to the terms of the Executive Order, the District Court declined to take any action until

Foremost-McKesson and the OPIC presented their claims against Iran to the Iran-United States

Claims Tribunal ("Claims Tribunal") in the Hague.  Id.[9]  The plaintiffs, still seeking to recover

damages for their alleged losses, revived the District Court case by filing a motion for partial

summary judgment against Iran alleging facts that "arguably support[ed] a conclusion that the

dairy was expropriated after the 1981 limit to the Claims Tribunal's jurisdiction."  Id. at 442.

Iran amended its answer to the complaint and concurrently filed a motion to dismiss, which was

denied by the District Court.  Id.

At the center of the interlocutory appeal filed by Iran after the denial of its dismissal

motion was the issue of whether Iran was immune from suit under the FSIA.  Id.  One specific

question on appeals was "whether the District Court erred in concluding that the actions

attributed to Iran in the complaint were sufficiently commercial and the effects sufficiently

---

[8]Foremost-McKesson sought damages only for the insured portion of its shares - 64% of its 31% ownership or 19.84% of the total shares.  Foremost-McKesson, 905 F.2d at 441 n.5.

[9]The Claims Tribunal concluded that Pak Dairy had unlawfully withheld from Foremost-McKesson cash dividends and awarded it $900,000, plus interest, against Iran.  Id.  It also concluded that Pak Dairy failed to deliver to Foremost-McKesson stock certificates and breached certain contractual obligations and awarded Foremost-McKesson in excess of $500,000 in damages against Pak Dairy for the contract breaches.  Id. at 441-42.  Iran paid the amounts awarded out of the security account established at the Hague pursuant to the provisions of the Algiers Accords.  Id. at 442.

'direct' – pursuant to the commercial activity exception to sovereign immunity . . . – to withstand Iran's motion to dismiss." Id. at 442-43 (citation omitted).  Iran argued that "the complaint state[d] a claim for expropriation – a governmental act, not a commercial one – and hence jurisdiction [was not] obtain[ed] under the 'commercial activity exception.'" Id. at 449.

The District Court had rejected Iran's position, reasoning that "there had been no formal declaration by the Government of Iran nationalizing Pak Dairy and that 'the nature of the actions complained of by Foremost[-McKesson] sound[ed] in the nature of a corporate dispute between majority and minority shareholders.'" Id. at 449-50 (citation omitted).  The District Court had further concluded that "Foremost's 'claim essentially involve[d] allegations that Iran, acting through its various co-defendants on Pak Diary's Board of Directors, used its majority position to lock Foremost out of the management of the company and den[ied] Foremost its share of the company's earning in the form of dividends.'" Id. at 450.  The District Court therefore found that the complaint "allege[d] actions that were both commercial and governmental in nature." Id. It also recognized that when a "'transaction partakes of both commercial and sovereign elements,' 'jurisdiction will not obtain if the cause of action is based on a sovereign activity.'" Id. (quoting Millen Indus., Inc. v. Coordination Council for No. Am. Affairs, 855 F.2d, 879, 885 (D.C. Cir. 1988).  On appeal, the District of Columbia Circuit also noted that Iran had "offered no countervailing evidence indicating that the[] alleged commercial acts were subsumed within a sovereign activity." Id.  Indeed, the Circuit Court pointed out that there was "no indication that Iran nationalized Pak Dairy by taking it over through a process of law." Id.  Accordingly, "[i]n the absence of such countervailing evidence . . . ," the District of Columbia Circuit ruled that "the District Court properly concluded that the actions alleged were sufficiently commercial in

nature to withstand Iran's motion to dismiss." Id. at 450 (footnote omitted).

The present case is distinguishable from Weltover and Foremost McKesson in many respects. As an initial matter, both of those cases were breach of contract actions in which the plaintiffs had actually entered into contracts with the sovereigns. Weltover, 504 U.S. at 607; Foremost-McKesson, 905 F.2d at 441-442. Here, there is no allegation in the complaint that the LPG had contractual relations with any of the plaintiffs. Moreover, there is no allegation that the LPG owned any shares in Broadsino prior to the acquisition of the Brilliance stocks by Huachen.

In Weltover, Argentina "act[ed], not as a regulator of the market, but in the manner of a private player within it. . . ." Weltover, 504 U.S. at 614. On the other hand, a private player in the market could not do what the LPG did. Namely, the Assistant to the Governor of the LPG was not acting as a private player when he formed a Working Committee "to assume and exercise control over the Foundation and to acquire from it the Brilliance shares that it held in trust for Broadsino and the interests of Yang Rong in other companies." Compl. ¶ 35. And unlike the plaintiffs in Foremost-McKesson, where the board of directors of the dairy used its majority position to take the action challenged by the plaintiffs, here the LPG unilaterally invoked the act of sovereign expropriation by "advis[ing] Rong that all equity interests held in the name of the Foundation, including Broadsino's interest in Brilliance, were state assets and demand[ing] that they be transferred to the LPG." Id. Other actions of the LPG also support this Court's conclusion. For example, the Foundation, which is "controlled by the LPG," informed the board of directors of Brilliance and Rong that the Foundation no longer recognized Broadsino's beneficial interest in Brilliance and dismissed Rong from the positions he held as a member of the board of directors, Chairman, President, Chief Executive Officer and Director of

18

Brilliance and replaced him with individuals who were members of the Working Committee.  Id.
¶ 36.  Clearly, these actions could not be taken by a private player in the market in the absence of
a commercial relationship between the plaintiffs and the sovereign that had conferred to the
sovereign some authority, by contract or otherwise, over the plaintiffs.

Unlike the plaintiffs in Foremost-Mckesson, the complaint does not allege that the LPG
ever had any kind of commercial relationship with the plaintiffs.  In fact, the LPG has maintained
throughout that the "shares at issue are in fact state assets."  Reply in Support of Motion of
Liaoning Provincial Government to Dismiss First Amended Complaint ("Def.'s Reply") at 3
(citing Compl. ¶ 35).  Additionally, Brilliance, acting at the direction of the LPG, reduced Rong's
salary by two-thirds and ultimately ceased paying him any salary by October 2002.  Id.  And, the
Brilliance board of directors, at the direction of the LPG, eventually terminated the service
contract between Rong and Brilliance.  Compl. ¶ 36.  These actions are more akin to those of a
regulator of a market, not those of a private participant in the market.  In other words, the LPG's
actions were not the "type of actions by which a private party engages in 'trade and traffic or
commerce.'"  Weltover, 504 U.S. at 614.  Rather, the LPG actions are more analogous to
sovereign expropriation – the LPG's unilateral decision to declare the assets of the Foundation
state assets.  See Beg v. Islamic Republic of Pakistan, 353 F.3d 1323, 1328 (11th Cir. 2003)
("Expropriation is neither the type of activity in which private actors engage nor is it a market
transaction.").

The allegations in the complaint regarding the ultimate disposition of the Brilliance
stocks, i.e., the LPG's formation of Huachen, the appointment of members of the LPG as officers
of Huachen, and the sale to Huachen of the Brilliance stocks held by the Foundation in trust for

Broadsino, see Compl. ¶¶ 36, 37 & 39, do not transform the LPG's expropriation into commercial activity.  In suggesting otherwise, the plaintiffs "confuse general activity related to the claim with the specific activity upon which the claim is based."  Junquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1030 (D.C. Cir. 1997) (although aspects of foreign medical treatment program were related to commercial activity, the actions that formed the basis of the plaintiff's claims were not commercial in nature.) (citation omitted).  The underlying basis of the plaintiffs' claim is sovereign expropriation, not the subsequent acquisition of the Brilliance shares by Huachen. Furthermore, as the plaintiffs acknowledge, in March of 2002, the LPG formed the Working Committee and advised Rong that "all equity interests held in the name of the Foundation, including Broadsino's interest in Brilliance and [] Rong's other interests were state assets and demanded that they be transferred to the LPG."  Compl. ¶ 35.  Huachen was not incorporated until September of 2002, id. ¶ 37, six months after the expropriation.  Thus, the allegation that "the basis for [the p]laintiffs' claim is that the acquisition of the Brilliance shares by Huachen was a commercial act, Pls.' Opp'n at 13, is misplaced.  The Court therefore concludes that the LPG's actions were distinctly those of a sovereign, rather than those that occur in the commercial marketplace.[10]

---

[10]Under the third clause of Section 1605(a)(2) of Title 28 of the United States Code, not only must the challenged actions amount to commercial activity, but it must also have a "direct effect in the United States."  28 U.S.C. § 1605(a)(2).  That means the effect in the United States cannot be "'purely trivial,'" but instead must "follow[] as an 'immediate consequence of the defendant's . . . activity.'"  Princz v. Fed. Republic of Germany, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (quoting Weltover, 504 U.S. at 618).  However, because the Court has concluded that the LPG's actions constituted sovereign expropriation and not commercial activity within the meaning of the FSIA, the Court "need not determine whether [the LPG's] alleged conduct caused a 'direct effect' in the United States," see Hwang-Geum Joo v. Japan, 172 F. Supp. 2d 52, 64 n.8 (D.D.C. 2001), as the language of the third clause of § 1605(a)(2) makes involvement in commercial activity a prerequisite to the need to address the "direct effect" question.

2.     **Expropriation Exemption**

As a separate basis for this Court's purported jurisdiction, the plaintiffs assert the applicability of § 1605(a)(3) of the FSIA.  Compl. ¶ 16.  This clause allows claims to be pursued in federal court against foreign sovereigns in cases

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).  For this exception to foreign sovereign immunity to apply, "a court must find that: (i) rights in property are at issue; [and] (ii) those rights were taken in violation of international law; . . ."  Peterson, 332 F. Supp. 2d at 196.  Additionally, the court must find that one of two "jurisdictional nexus between the expropriation and United States" are satisfied.  Id. at 197.  This nexus can be established "by showing that the property at issue or any property exchanged for it: (a) 'is present in the United States in connection with a commercial activity carried on in the United States by the foreign state,' or (b) 'is owned or operated by an agency or instrumentality of the foreign state and that the agency or instrumentality is engaged in commercial activity in the United States.'"  Id. (quoting 28 U.S.C. § 1605(a)(3); Lord Day & Lord v. The Socialist Republic of Vietnam, 134 F. Supp. 2d 549, 560 (S.D.N.Y. 2001).  The plaintiffs claim that the LPG's actions satisfy the requirements of § 1605(a)(3) of the FSIA.  Compl. ¶ 17.  The Court disagrees with the plaintiffs' assessment for two reasons.

### a.    Are "Rights in Property" at Issue?

As an initial matter, "[c]ourts considering the expropriation exception have held that it only applies where the property at issue is "'tangible property.'" Peterson, 332 F. Supp. 2d at 197 (quoting Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, No. 94 Civ.1942 (KMW) (AJP) 1996 WL 413680 at *8 (S.D.N.Y. July 24, 1996)).  Indeed, courts have held that "[p]roperty taken within the meaning of the statute means 'physical property' not the right to receive payment."  Lord Day, 134 F. Supp. 2d at 560 (quoting Hirsh v. State of Israel, 962 F. Supp. 377, 383 (S.D.N.Y.1997) (citing Canadian Overseas Ores Ltd. v. Compania de Acero, 528 F. Supp. 1337 (S.D.N.Y.1982) (holding that contractual rights to payment, absent an expropriation of real property, do not constitute "property" within the meaning of the FSIA)).

Here, the plaintiffs have consistently referred to their property as "shares held in trust for the benefit of Broadsino."  See, e.g., Compl. ¶¶ 28, 31, 33 & 34.  Yet, in their opposition to the motion to dismiss, they assert that "the LPG took property they owned and placed it in the hands of the Foundation for safekeeping, and the LPG failed to provide them adequate compensation." Pls.' Opp'n at 24.  The plaintiffs conclude that this assertion "pleads a violation of their property rights under international law sufficient to place them within § 1605(a)(3)."  Id.  The plaintiffs rely on West v. Multibanco Comermex, S.A., 807 F.2d 820 (9th Cir. 1987) for the proposition that "the tangible/intangible characterization of property interests . . . is a distinction without a difference;' and that '[t]his distinction is not generally recognized in international, federal, or state law."'  Pls.' Opp'n at 23 (quoting West, 807 F.2d at 830).  However, the Court in West specifically reached its conclusion with respect to the applicability of the Second Hickenlooper

Amendment, 22 U.S.C. § 2370(e)(2), not the FSIA.[11]  West, 807 F.2d at 830.  Thus, the plaintiffs

take exception with the authority that attaches the tangible property requirement to the FSIA by

relying on a case that construed a different statute.  In West, individual United States investors

purchased peso and dollar denominated certificates of deposit issued by private Mexican banks.

Id. at 822.  As a result of a serious deficiency in the foreign currency reserves Mexico needed to

repay its debts, the Government of Mexico issued a number of decrees that affected certificates

of deposit in Mexican banks, including those held by the plaintiffs, and eventually nationalized

the entire private banking system.  Id.  Additionally, the Mexican government issued a provision

eliminating all bank deposits in foreign currency and specified that repayment of those deposits

were to be made in pesos at a rate of exchange to be determined by Mexico's central bank.  Id. at

823.  When the certificates of deposit matured following the nationalization of the banks, losses

were realized when the peso accounts were converted to dollars in the United States.  Id.  In

asserting the act of state doctrine,[12] the defendants in West argued that the Hickenlooper

Amendment was inapplicable because "rights arising out of ownership of certificates of deposit

---

[11]The Second Hickenlooper Amendment ("Hickenlooper") "overrides the judicially developed doctrine of act of state," West, 807 F.2d at 829, and "authoriz[es] courts to apply established law [in] suits challenging expropriations."  Id. at 829-30 (quoting Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1542 n. 180 (D.C. Cir. 1984), vacated and remanded because of subsequent legislation, 471 U.S. 1113 (1985).  "The purposes of the amendment include the promotion and protection of United States investment in foreign countries (which characteristically has always principally been land, minerals, and large fixed movables), and securing the right of a property holder to a court hearing on the merits.  Id.  Hickenlooper was passed in response to the Supreme Court's decision in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964), which barred adjudication of an expropriation claim on act of state grounds.  Id. at 829.  When Hickenlooper governs, "courts are barred from invoking the judicially created doctrine under which [courts] refrain from consideration of cases involving acts of foreign government or foreign officials.  Id. (footnote omitted).

[12]"The act of state doctrine is a combination justiciability and abstention rule developed in pre-Erie days and reaffirmed in" Sabbatino, 376 U.S. 398.  Id. at 827.  It "prohibits U.S. courts from reaching the merits of an issue - - even though we otherwise have jurisdiction - - in order to avoid embarrassment of foreign governments in politically sensitive matters and interference with the conduct of our own foreign policy."  Id.  The Hickenlooper Amendment "overrides the judicially developed doctrine of act of state."  Id. at 829.

are contractual, and hence not 'tangible property' which can be taken by expropriation within the meaning of the amendment." Id. at 829.  Although the West Court recognized support in law for this proposition, the Court reasoned that "it is based largely upon an overly formalistic attachment to private law categories and is contrary to the motivating policies of the Hickenlooper Amendment." Id.  Thus, the Court concluded that "the rights arising from a certificate of deposit are 'rights to property' capable of being expropriated by foreign states under international law within the meaning of Hickenlooper." Id. at 830.  The Court reached this conclusion in part because the legislative history of the Hickenlooper Amendment "supports the rejection of a constricted interpretation [of property] and makes it clear that the protection afforded U.S. investments was to be broad in scope." Id.

Here, the Hickenlooper Amendment is not applicable because as discussed below, there has been no violation of international law.  See discussion infra III.A.2.b.  Additionally, the Amendment is inapplicable because the property at issue is not located in the United States.  See, e.g., Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc., 686 F.2d 322, 327 (5th Cir. 1982) ("[W]e hold that the Hickenlooper amendment is inapplicable because neither the nationalized property nor its proceeds are located in the United States"); Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co., 652 F.2d 231, 237 (2d Cir. 1981) (Amendment applies "only to cases in which the expropriated property has found it way back into the United States" and "[s]ince in this case the seized assets are still in Cuba, the Hickenlooper Amendment does not apply"); Restatement (Third) of Foreign Relations § 444 cmt. e (1987) (Amendment is "limited to actions asserting title to property before the court  . . . .  [T]he plaintiff must allege and prove that the property that is the subject of the claim is in the United States or was there at

the time the action was commenced.").[13]   Moreover, because the purposes of the amendment include the "promotion and protection of United States investment in foreign countries," West, 807 F.2d at 830, the Hickenlooper Amendment does not apply to the plaintiffs because they were Chinese nationals at the time of the expropriation.  See discussion infra III.A.2.b.

Notwithstanding this analysis of the applicability of the Hickenlooper Amendment, which does not distinguish between whether property is tangible or intangible when considering "the protection afforded U.S. investments," West, 807 F.2d at 830, the Court must still consider whether the property at issue here must be tangible property when considering the expropriation exception of the FSIA.  Contrary to the plaintiffs' assertion, as to the FSIA, the West case does not stand the for the proposition that "the tangible/intangible characterization of property interests . . . is a distinction without a difference;" and that "[t]his distinction is not generally recognized in international, federal, or state law."  West, 807 F.2d at 830; Pls.' Opp'n at 23. West was only construing the Hickenlooper Amendment.  Thus, West did not address the scope of the expropriation exception of the FSIA with respect to whether property must be tangible property.  West, 807 F.2d at 830.

The plaintiffs also rely on Altmann v. Republic of Austria, 317 F.3d 954 (9th Cir. 2002) and Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia, 616 F.

---

[13]The plaintiffs rely on Ramirez de Arellano v. Weinberger, 745 F.2d 1500 (D.C. Cir. 1984) for their proposition that the "D.C. Circuit has flatly rejected the 'suggestion that the word 'property' in the [Second Hickenlooper Amendment] must invariably be limited to expropriated personal property located in the United States.'"  Pls.' Opp'n at 31 (citing Ramirez, 745 F.2d at 1541).  However, Ramirez was vacated by the Supreme Court, 471 U.S. 1113 (1985), and therefore has no precedential value.  Al Odah v. United States, 321 F.3d 1134, 1143 (D.C. Cir. 2003) (cases vacated by the Supreme Court have no precedential value).  In fact, when the District of Columbia Circuit re-issued its opinion in Ramirez, it reached the opposite result on other grounds.  See Ramirez de Arellano v. Weinberger, 788 F.2d 762 (D.C. Cir. 1986).

Supp. 660 (W.D. Mich. 1985) as support for their position with respect to intangible property

interests.  Altmann involved the confiscation of paintings by the Nazi government in violation of

international law.  Altmann, 317 F.3d at 954.  The Altmann Court concluded that the "facts

alleged [fell] . . . "squarely within the expropriation exception to sovereign immunity," in part

because "[t]here [was] no question but that 'rights in property' [were] in issue," id. at 968, the

property being the confiscated paintings, which clearly constituted tangible property.

Accordingly, intangible property was not at issue in Altmann.  In Kalamazoo, "the Court held

that the FSIA covered the governmental seizure of fifty one percent of a company's stock in

another entity because it was a 'controlling interest' akin to physical assets."  Peterson, 332 F.

Supp. 2d at 197 n.2 (citing Kalamazoo, 616 F. Supp. at 663)  The Kalamazoo Court concluded

that

> section 1605(a)(3) can only logically be interpreted to encompass
> the property interest seized in this case.  It would not make sense to
> distinguish between the expropriation of the physical assets of a
> company, which would clearly fall within section 1605(a)(3), and
> expropriation of a controlling interest in the stock of the company.
> In either case, the foreign state has expropriated control of the
> assets and profits of the corporation.  Thus . . . the property at issue
> in this case is the kind of property that is subject to this Court's
> jurisdiction under section 1605.

Id. at 663 (emphasis in original).  As in Peterson, where the Court decided that the plaintiff's

position "that the rights in property do not have to be tangible" was not well founded, 332 F.

Supp. 2d at 197 n.2, this Court likewise is not persuaded by the plaintiffs' position on this point.

As the prevailing case law holds, the FSIA applies where the property at issue is "tangible

property." Id. at 197.  Regardless of how the plaintiffs here seek to characterize the property at

issue, it is not "physical property" within the meaning of the FSIA.  Lord Day, 134 F. Supp. 2d at

560.  In any event, whether the plaintiffs' interests are tangible or intangible is of no moment

because, as discussed below, there has been no violation of international law.

### b.        Did the LPG Violate International Law?

Both parties agree that Broadsino is a corporation organized under the laws of Hong

Kong, and is therefore a citizen of China pursuant to the laws of the United States.  Compl. ¶  10

& Def.'s Mem. at 20; Favour Mind, Ltd. v. Pacific Shores, Inc., 1999 WL 1115217, at *7-*9

(S.D.N.Y. Dec. 7, 1999) (Hong Kong corporation is a citizen of China under 28 U.S.C. §

1332(a)(2); Tukas Co. v. Continuum Co., 2001 WL 114339, at *1 (S.D.N.Y. Feb. 9, 2001).

Because Broadsino is a Chinese corporation, it cannot claim a taking in violation of international

law because "[e]xpropriation by a sovereign state of the property of its own nationals does not

implicate settled principles of international law."  Chuidian v. Philippine Nat'l Bank, 912 F.2d

1095, 1105 (9th Cir. 1990) (citing De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385,

1396-98 (5th Cir. 1985)).

Even though the plaintiffs concede that Broadsino is a Hong Kong corporation,  Pls.'

Opp'n at 27, they point out that when Broadsino was established in 1991 Hong Kong was still a

colony of the United Kingdom and it was "considered a foreign national with respect to China,

and customary international law therefore protected it against any unjust expropriation of its

property by the LPG."  Id.  The plaintiffs then posit that "because international law protected

Broadsino against an unjust expropriation of its property by China prior to July 1997, and

because the Joint Declaration and Basic Law preserve the rights Hong Kong residents and

citizens enjoyed prior to July 1997, Broadsino is a foreign national for purposes of the

expropriation of its stocks held by Brilliance." Id. at 27-28.  The Joint Declaration referenced by

the plaintiffs as support for their position is the Joint Declaration of the Government of the

United Kingdom of Great Britain and Northern Ireland and the Government of the People's

Republic of China on the Question of Hong Kong, Dec. 19, 1984 23 I.L.M. 1366, 1371 (1984)

("Joint Declaration").  The plaintiffs claim that the "Joint Declaration was an agreement the U.K.

established with China in order to ensure that the rights of Hong Kong citizens and residents,

including the rights they held under Hong Kong's common law (which included international

law), would be preserved for fifty years after the hand-over of Hong Kong to China in July

1997."  Pls.' Opp'n at 27 (footnote omitted).

The plaintiffs' argument is unpersuasive as it has no support in the law.  Chinese law

expressly manifests China's intent to confer Chinese citizenship to Hong Kong residents and

corporations.  See, 22 U.S.C. § 5701(1)(A) (stating that the People's Republic of China will

resume the exercise of sovereignty over Hong Kong on July 1, 1997); Basic Law of Hong Kong

Special Administrative Region of the People's Republic of China, April 4, 1990 (Basic Law of

Hong Kong"), Ch. II Art. 12 ("The Hong Kong Special Administrative Region of the People's

Republic of China, which shall . . . come directly under the Central People's Government.").

Def.'s Reply at 9-10 & Ex. 3, Tab B (Basic Law of Hong Kong).  The Joint Declaration also

states that as of July 1, 1997, "The Hong Kong Special Administration Region will be directly

under the authority of the Central People's Government of the People's Republic of China.  See

id. at 10 & Ex. 3, Tab C (Joint Declaration).  Thus, there is no basis in law to support the

plaintiffs' position that Broadsino remains subject to the laws of the United Kingdom that were

in effect prior to Hong Kong's 1997 reversion to China.  Accordingly, because Broadsino is a

corporation organized under the laws of Hong Kong, the LPG's actions did not contravene international law. Therefore, section 28 U.S.C. §1605(a)(3) does not provide a basis for invoking an exception to the foreign sovereign immunity bar to this Court's jurisdiction.  Id.

The doctrine that international law does not generally govern disputes between a country and its own nationals rests on fundamental principles.  De Sanchez, 770 F.2d at 1397.  Indeed,

> It may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the "general assent of civilized nations." We cannot elevate our American-centered view of governmental taking of property without compensation into a rule that binds all "civilized nations."

Id.  Moreover, "confiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law."  F. Palicio y Compania, S. A. v. Brush, 256 F. Supp. 481, 487 (S.D.N.Y. 1966); United States v. Belmont, 301 U.S. 324, 332 (1937) ("What another country has done in the way of taking over property of its nationals . . . is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled.").

This analysis applies equally to Rong and his wife because he is still a Chinese national, and his wife was a Chinese national at the time of the taking.  See Compl. ¶¶ 8; 9. Notwithstanding the plaintiffs' assertion that Rong is a United States national because he has applied for United States citizenship, the clear weight of authority holds that "a person may become a national of the United States only through birth or naturalization."  See Perdomo-Padilla v. Ashcroft, 333 F.3d 964, 966 (9th Cir. 2003).  And the plaintiffs' claim that Rhea

Yeung became a United States citizen in August of 2002,  Pls.' Opp'n at 26, does not alter the

Court's conclusion that the plaintiffs cannot seek redress in this Court.  This is because although

the plaintiffs consistently refer to the "acquisition by Huachen of the Brilliance shares" as the

alleged taking, this Court has already determined that the expropriation occurred in March of

2002, when the LPG "advised Rong that all equity interests held in the name of the Foundation,

including Broadsino's interest in Brilliance, were state assets and demand[ed] that they be

transferred to the LPG."  See discussion infra Part III.A.1 & Compl. ¶ 35. Moreover, in June of

2002, Rong was dismissed from Brilliance as Chairman, President and Chief Executive Officer

and replaced by members of the LPG Working Committee.  Id. ¶ 36.  Both of these events took

place months before Rhea Yeung became a United States Citizen.  Id.; see, Richard W. Barrett,

Avoiding the Expropriation Nightmare - - Tax Consequences and Asset Protection Techniques,

52 U. Miami L. Rev. 831, 845 (1998) ("Expropriation had occurred when the owner's

management or directors had been replaced by the [] Government."); Charles N. Brower, Current

Developments in the Law of Expropriation and Compensation: A Preliminary Survey of Awards

of the Iran-United States Claims Tribunal, 21 Int'l Law 639, 647-48 (1987) ("The replacement of

the owner's management or directors with representatives appointed by the Government

generally has been a dispositive factor, resulting in a holding of expropriation as the point when

the former managers or directors are no longer able to participate in management.) (citing Starrett

Hous. Corp. v. Iran, 4 IRAN–U.S. C.T.R. 122, 155 (1983).[14]  Thus, both Rong and his wife were

---

[14]This case is derived from the Iran-United States Claims Tribunal, which was established under the Declaration Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran, dated January 18, 1981.  INT-IRAN (International Law - Iran-United States Claims Tribunal Decisions) database.

Chinese nationals at the time of the expropriation.  And because "international law does not

generally govern disputes between a state and its own nationals,"  De Sanchez, 770 F.2d at

1397,[15] 28 U.S.C. § 1605(a)(3) provides no basis for this Court having subject matter jurisdiction

in this case.[16]

## IV.     Conclusion

The Court is convinced that none of the exceptions to the FSIA relied upon by the

plaintiffs are applicable in this case.  Accordingly, the defendant's motion to dismiss is granted

because this Court is without subject matter jurisdiction and therefore may not entertain the

plaintiffs' claims.[17]

**SO ORDERED** on this 3rd day of March, 2005.[18]

REGGIE B. WALTON
United States District Court Judge

---

[15]"Only where a state has engaged in conduct against its citizens that outrages basic standards of human rights or that calls into question the territorial sovereignty of the United States is it appropriate for [a United States District Court] to interfere." De Sanchez, 770 F.2d at 1398.

[16]Because this Court finds that there are no "rights in property at issue" and no "violation of international law," it will not consider the two alternative nexus requirements - that property must "either (a) be present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or (b) be owned operated by an agency or instrumentality of the foreign state that is engaged in commercial activity." Lord Day, 134 F. Supp. 2d at 560.  Likewise, because the commercial activity and expropriation exceptions to the FSIA do not confer jurisdiction to this Court, it will not entertain the defendant's three remaining arguments for dismissal of the complaint, namely, its arguments concerning the act of state doctrine, international comity, and issue and claim preclusion.

[17]The plaintiff has also filed a Motion to Strike Portions of Defendant's Reply Memorandum [D.E. #16]. This motion is denied.

[18]An Order consistent with this Memorandum Opinion was issued on February 28, 2005.